UNITED STATES of America, Appellee,

v.

Michael McFADDEN, a/k/a Michael Hughes, Defendant, Appellant.

UNITED STATES of America, Appellant,

v.

Michael McFADDEN, a/k/a Michael Hughes, Defendant, Appellee.

Nos. 92–2265, 92–2340.

United States Court of Appeals, First Circuit.

Heard Sept. 9, 1993.

Decided Jan. 18, 1994.

---

Alan D. Rose with whom Marilee Denelle and Nutter, McClennen & Fish were on brief, for defendant, appellant.

Lon F. Povich, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., was on brief, for appellee.

Before BREYER, Chief Judge, ALDRICH, Senior Circuit Judge, and McAULIFFE,* District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

Defendant was indicted in two counts: Count One, "On or about February 26, 1991, at Boston ... defendant herein did knowingly and intentionally possess with intent to distribute ... cocaine ... in violation of Title 21, United States Code, Section 841(a)(1)." Count Two, "On or about February 26, 1991, at Boston ... defendant herein did knowingly and intentionally use a firearm ... during and in relation to the drug trafficking crime alleged in Count One of this Indictment ... in violation of Title 18, United States Code, Section 924(c)." A jury found him guilty on both counts. The court sentenced him to 21 months on Count One, including points for possession of a firearm under Sentencing Guidelines.[1] It ordered an acquittal on Count Two. From this the government appeals. Defendant appeals in other respects. The only error we find is the acquittal. We start there.

Section 924(c) provides, "Whoever during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm" shall receive a mandatory sentence of five years, to be served on and after the sentence for the principal offense. The seriousness with which Congress viewed this conduct is emphasized by the fact that it denied parole at a time when parole was ordinarily available as a matter of course. If this may suggest apprehension of violence (*see also* §§ 924(c)(2) and (3)), the Court has not so restricted the statute. *Smith v. United States*, —— U.S. ——, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (gun bartered for drugs constitutes "use" in relation to drug trafficking).

Before discussing the statute further, we review the facts in the light, of course, most favorable to the government. *United States v. McNatt*, 813 F.2d 499, 502 (1st Cir.1987).

---

* Of the District of New Hampshire, sitting by designation.

1. U.S.S.G. § 2D1.1(b)(1) calls for a two level enhancement, "[i]f a dangerous weapon (including a firearm) was possessed." This is an alternative to a conviction under § 924(c). U.S.S.G. § 2K2.4 (commentary).

Defendant, an 18 year old student, dealt in "twenties," $20 single packs of crack cocaine.[2] On February 26, 1991, two undercover officers, armed with a warrant, rang the downstairs doorbell to his apartment, and asked for two twenties. Defendant brought down two from his room and the transaction, concededly, all took place in the foyer. As an officer sought thereafter to seize him, declaring his identity, defendant fled upstairs, locking his door. The officers broke down the door and conducted a search. This revealed their marked money under his mattress, together with an unloaded shotgun. Under the bed, in a container, were more money and packs. Was this use of the gun "in relation to the crime"?

That the gun was unloaded, and no ammunition found, could be evidence in defendant's favor, but unloaded guns can be used aggressively. *McLaughlin v. United States,* 476 U.S. 16, 17–18, 106 S.Ct. 1677, 1678, 90 L.Ed.2d 15 (1986) (unloaded gun is "dangerous weapon" for purposes of 18 U.S.C. § 2113(d)). Nor would use be rebutted by lack of ownership. *See United States v. Wight,* 968 F.2d 1393 (1st Cir.1992). The jury, further, could reject defendant's claim that the gun belonged to his sister's former boyfriend, and that he was merely hiding it from his nephews. While mere possession is not a crime, the government properly asked the jury, why did he keep it?

We agree with defendant that the word "uses" calls for something more than "possesses." We may further agree that in defendant's transaction with the officers he did not use the gun, and had no intent to. The difficulty is that the drug trafficking crime, as defined in 21 U.S.C. § 841(a)(1), with which he was charged was possession with intent, not the sale. We have held that mere presence of arms for the protection of drugs for sale is present use. *United States v. Wilkinson,* 926 F.2d 22 (1st Cir.) (guns in duffel bag with cocaine), *cert. denied,* —— U.S. ——, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991); *United States v. Hadfield,* 918 F.2d 987 (1st Cir.1990) (guns on the drug premis-

es), *cert. denied,* —— U.S. ——, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991). Wilkinson's taking guns with the drugs to someone else's house would seem active use. And it is true that defendant Hadfield publicly advertised that he had guns, clearly a present use as a deterrent. However, we based our opinion broadly, on simple presence for protection, the maintenance of a "fortress."

It could be said that mere maintenance of a secret fortress is not a present use, but is an intent regarding possible future use. However, we did not, and the majority of the circuits do not, draw that distinction. *See United States v. Wesley,* 990 F.2d 360, 365 (8th Cir.1993) ("presence and ready availability of a firearm at a house where drugs are dealt" is sufficient); *United States v. Young–Bey,* 893 F.2d 178, 181 (8th Cir.1990) (presence and availability crucial), cited with approval in *Hadfield* and *Wilkinson; United States v. Hager,* 969 F.2d 883, 889 (10th Cir.) (following *Hadfield), cert. denied,* —— U.S. ——, 113 S.Ct. 437, 121 L.Ed.2d 357 (1992); *United States v. Torres–Medina,* 935 F.2d 1047, 1049–50 (9th Cir.1991) (availability sufficient); *United States v. Boyd,* 885 F.2d 246, 250 (5th Cir.1989) ("It is enough that the firearm was present at the drug-trafficking scene, that the weapon could have been used to protect or facilitate the operation, and that the presence of the weapon was in some way connected with the drug trafficking"), cited with approval in *Hadfield* and *Wilkinson; United States v. Acosta–Cazares,* 878 F.2d 945, 952 (6th Cir.) ("We hold that 'uses' and 'carries' should be construed broadly to cover the gamut of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions"), cited with approval in *Hadfield, cert. denied,* 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989). *But see United States v. Robinson,* 997 F.2d 884 (D.C.Cir.1993); *United States v. Derr,* 990 F.2d 1330 (D.C.Cir.1993).

There is, of course, a difference between a large quantity of cocaine with a "fortress" of guns, and a $20 dealer with two grams of cocaine and an unloaded shotgun, but it is a

---

**2.** At sentencing it appeared that the government had weighed seven of eighteen packs and that they totalled .83 gram.

difference in degree, not in kind. It can not be for the court to control the U.S. Attorney's use of this truly fortress of a statute; a defendant's only hope is the U.S. Attorney's judgment, and the jury. Here he failed.

Alternatively, defendant seeks a new trial. We have examined his several contentions with care, but they require little comment. Defendant's complaints as to the charge, and to the weight of the evidence, are in accord with his claims on the acquittal, and must fail equally. The court's adjustments and failure to adjust the sentence on Count One were, routinely, within its discretion.

A word as to the dissent. We share in approving the flexibility of the Sentencing Guidelines, but we see no give, and no surrender, in this monolith of a statute, on the books for many years and not disturbed when the Guidelines were enacted. Moreover, how does one measure for this? And in what way do our differing facts, on a case by case basis, indicate that we are taking a new approach? Only one gun? Possible lack of title? No ammunition? [3] Lack of exhibiting? No instant access? Under our cases none of these failures is fatal. The reason for this is that the difference between mere possession and use is in the mind of the user. *United States v. Payero*, 888 F.2d 928, 929 (1st Cir.1989) (possession lending courage is use); *Wilkinson*, 926 F.2d at 25 ("emboldening," quoting *United States v. Stewart*, 779 F.2d 538, 540 (9th Cir.1985)); *United States v. Castro–Lara*, 970 F.2d 976, 983 (1st Cir. 1992), *cert. denied sub nom Sarraff v. United States*, — U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 684 (1993) (possession with "intent to have it available for possible use"); *Wilkinson* at 26 ("intended the guns for protection").

Was the stash too small to make intent more than a theoretical possibility? Even without defendant's admission, "It's good protection for anyone in the neighborhood to have a gun in their house also because people get robbed," we cannot think that $360 in drugs plus $510 in cash, would not warrant a jury's finding that defendant's thinking included the gun. The statute does not measure the crime. In light of the accounts we read daily of mayhem over trifles, we adopt what we said in *Wilkinson*, (and remembering what *Wilkinson* itself said was "help"), "[U]ltimately, whether or not the gun[ ] helped appellant commit the drug crime is a matter for a jury, applying common-sense theories of human nature and causation." 926 F.2d at 26. This is not to say that it need "automatically" find it. Nor is it to say that we like the inflexibility of this statute, or the judgment of the United States Attorney in invoking it for such a minor defendant.

*The case is remanded to the district court to vacate the acquittal; reinstate the verdict of guilty on Count Two; to sentence on Count Two, and to readjust the sentence on Count One appropriately.*

BREYER, Chief Judge (dissenting).

The narrow legal question before this panel is not *whether* possession of a gun ("in relation to the [drug] crime") means a longer sentence for a convicted drug dealer. It most certainly does. Nor is the question whether the "possession" here was *"in relation to"* the drug crime, *ante* at 464–65. It was. Rather, the question concerns *which sentencing statute* governs the precise length of the extra term of punishment, a blunt "mandatory minimum" gun "use" statute, 18 U.S.C. § 924(c) (mandatory five-year sentence), or the somewhat more sophisticated sentencing guideline statutes, under which extra punishment for drug-related gun possession varies with the seriousness of the drug crime. U.S.S.G. § 2D1.1(b)(1) (2–level sentence enhancement).

The answer to this question turns on the meaning of a single word in the "mandatory minimum" statute, the word "use." Does that word *"use"* include simple "possession" of a gun "connected with" a drug crime? If so, the majority is right, for I have no doubt that the jury here could find both a "posses-

---

**3.** While other circuits have held that lack of ammunition does not prevent conviction in a "drug trafficking crime," *e.g., United States v. Martinez*, 912 F.2d 419, 421 (10th Cir.1990), cited with approval in *United States v. Castro–Lara, post*, 970 F.2d at 983, we have held this only in a "crime of violence" case. *United States v. Kirvan*, 997 F.2d 963, 966 (1st Cir.1993) (gun need not be "loaded or operable"). We see no distinction.

sion" and some kind of "relation" or "connection" between gun and crime. But, in my view, prior cases, and likely congressional intent, indicate that the word "use," in this particular statute, carries a more active meaning—a meaning that excludes simple (drug-crime-related) possession.

Let me be more specific. The special "mandatory minimum" sentencing statute says that anyone who *"uses or carries"* a gun "during and in relation to any ... drug trafficking crime" must receive a mandatory five-year prison term added on to his drug crime sentence. 18 U.S.C. § 924(c). At the same time, the Sentencing Guidelines, promulgated under the authority of a different statute, 28 U.S.C. § 994, provide for a two-level (i.e., a 30% to 40%) sentence enhancement where a "firearm ... was possessed" by a drug offender, U.S.S.G. § 2D1.1(b)(1), unless the possession clearly was not "connected with the [drug] offense." *Id.* app. n. 3. The Guideline enhancement for drug-crime-related gun possession may amount to less than five additional years, as it would here. The specific question before us is whether, for sentencing purposes, courts should try to distinguish between a gun's drug-crime-related "use" and its drug-crime-related "possession," particularly when the predicate drug crime is "possession with intent to distribute."

Courts might have simplified the matter by answering this question in the negative. They might have reasoned that, at least in drug *possession* cases, virtually any possession of a gun amounts to "use" within the meaning of § 924(c). Arguably, *any* gun that is both possessed by a drug offender, and present at or near the site of a drug possession crime, helps the offender carry out the drug crime. It might do this by "emboldening" him, or perhaps by being available, should the need arise, to frighten others or to protect the drugs possessed. *Cf. United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985). Until today, however, courts have *not* taken this approach. On the contrary, they have insisted on maintaining a significant distinction between "possession" and "use" of a gun by drug offenders in the context of prosecutions under § 924(c).

*United States v. Castro–Lara,* 970 F.2d 976, 983 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 684 (1993); *United States v. Payero,* 888 F.2d 928, 929 (1st Cir.1989); *United States v. Robinson,* 997 F.2d 884, 887 (D.C.Cir.1993) (statute "conspicuously fails to criminalize mere possession").

Traditional tools of statutory interpretation support the near-universal judicial effort to maintain the distinction between (drug-related) "use" and "possession." First, the ordinary meanings of the words "use" and "carry"—the language in the "mandatory minimum" statute—connote activity beyond simple possession. *Cf. Smith v. United States,* —— U.S. ——, ——, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993) (the term "use" is to be given its "ordinary or natural meaning" in construing § 924(c)). Second, Congress wrote those words in the context of gun crime statutes that often use the broader word "possess" to describe the prohibited gun-related conduct. *See, e.g.,* 18 U.S.C. § 922(g), (q)(1)(A). As the somewhat hackneyed judicial aphorism goes, when Congress wants to criminalize gun possession, it knows how to do so. Third, a House Report accompanying the 1986 amendment to § 924(c) (which extended the statute to drug crimes) provides some indication of Congress's expectation about the meaning of the word "use." In the course of discussing the "carrying" part of the statute, the Report offers the example of a drug trafficker who "carrie[s]" a weapon "for protection against rival traffickers." Such a person quite clearly "possesses" the weapon with the intent to make active use of it if necessary; yet, the Report adds, "he did not actually *use* the weapon." H.R.Rep. No. 495, 99th Cong., 2d Sess. 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1336.

Most importantly, courts normally try to read language in different, but related, statutes, so as best to reconcile those statutes, in light of their purposes and of common sense. In this instance, one relevant statute, the statute creating the Sentencing Guidelines, reflects a major congressional effort to create a fairly sophisticated Sentencing Guidelines system that distinguishes among different

kinds of criminal behavior and punishes accordingly. The other statute, the mandatory minimum statute, represents an ad hoc deviation from that more general policy. Given the importance (to Congress) of the Guidelines system, *see Mistretta v. United States,* 488 U.S. 361, 363–370, 109 S.Ct. 647, 650–654, 102 L.Ed.2d 714 (1989), courts should take care not to interpret other statutes that represent ad hoc deviations from the basic congressionally-directed effort to rationalize sentencing with *unnecessary* breadth. Yet, here, to interpret the word "use" to encompass "possession" is to swallow up a guideline that distinguishes, for punishment purposes, among different kinds of drug- and gun-related criminal behavior. Moreover, it is to swallow up the guideline *unnecessarily,* for neither the language of the mandatory minimum statute nor its purpose (the need to punish drug offenders with guns) requires that it do so.

I confess that it is easier to see the need to distinguish (drug-crime-related) "use" from "possession" than it is to explain just how to make the distinction. Courts might have interpreted "use" by insisting upon *activity* with the gun, such as firing it or brandishing it, or, at least, displaying it (or even trading it for drugs, *see Smith, supra* ). But they have not done this. Rather, they have held that the word "use" sometimes encompasses more passive activity, such as "possession," but sometimes it does not. Thus, we must try to articulate the distinguishing line they have drawn.

As I read the case law, when courts have held that "use" encompasses "possession," they have always found (1) possession, (2) in connection with a drug crime, and (3) *something more. See United States v. Wilson,* 884 F.2d 174, 177 (5th Cir.1989) (except in "drug fortress" cases involving large amounts of drugs and money, "something more than strategic proximity of drugs and firearms is necessary to honor Congress' concerns."). And, they have tended to describe this "something more" as possession of the guns *for protection* of the drugs, thereby "facilitat[ing]" the drug crime. *See, e.g., United States v. Wilkinson,* 926 F.2d 22, 26 (1st Cir.) (conviction sustained where circumstances allowed jury to find that defendant "intended the guns for protection"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991); *United States v. Hadfield,* 918 F.2d 987, 998 (1st Cir.1990) (conviction sustained "so long as one purpose in situating the weapon nearby was to protect the narcotics enterprise"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991); *United States v. Payero,* 888 F.2d 928, 929 (1st Cir.1989) (conviction possible where firearm gave defendant courage by allowing him to protect himself); *United States v. Bruce,* 939 F.2d 1053, 1055 (D.C.Cir. 1991) (guns may be "used" in relation to a possession crime "because they are intended to protect the stash of drugs that will subsequently be distributed"); *ante* at 465 ("mere presence of arms *for the protection of drugs for sale* is present use") (emphasis added).

Of course, language such as "possession for protection" would not help the problem very much if that language itself were broadly interpreted or applied. If, for example, courts simply said that possession of a gun when drugs are around means *a fortiori* that the gun is present "for protection" of the drugs, the mandatory minimum statute's word "use" would (once again) swallow up the Guideline and eradicate the distinction between "use" and "possession" that courts have tried to maintain. It is therefore not surprising that the courts have *not* interpreted or applied this language broadly. They have avoided the "swallowing up" result by applying the "possession for protection" concept only where circumstances demonstrate that a drug offender, possessing a gun (in connection with the crime), *would likely* put the gun to active use (such as firing or brandishing it, or at least displaying it in an effort to intimidate) *were the need to arise.* In determining whether this later, active use is likely (i.e., in separating a theoretical possibility from a real risk), courts have looked at such factors as the gun's accessibility, whether it is loaded, the amount of drugs possessed, the presence of other guns, and the extent to which dangerous transactions likely take place nearby, as a way of deciding whether the "circumstances of the case show" that the gun was present for protection. *United States v. Plummer,* 964 F.2d

1251, 1254 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 350, 121 L.Ed.2d 265 (1992); *see, e.g., Robinson,* 997 F.2d at 887 (listing factors); *United States v. Derr,* 990 F.2d 1330, 1338 (D.C.Cir.1993).

Examined in light of the case law's possession/use distinction, the record before us indicates that this drug offender's "possession" of the gun, even if related to the drug crime, does not rise to the level of a "use." The defendant here was a small-time drug dealer, selling drugs in $20 packages. The police found a shotgun, unloaded, wrapped in a cloth bag, hidden between his bed's mattress and its box spring (but next to $40 the police had paid him, and above a strongbox on the floor containing two grams of cocaine and $510 cash). They found no ammunition anywhere in the apartment. The defendant testified, without contradiction and consistently with an earlier government affidavit, that the gun belonged to someone else. The gun was not visible, so its mere presence could not automatically have frightened a buyer or intruder. The defendant did not brandish, display, touch, or mention the gun during the transaction with police, nor was there any evidence that he had ever done so during the time he possessed drugs. To make active use of the gun in protecting his drugs or intimidating a buyer or intruder, he would have had to lift the mattress, seize the gun, and unwrap it. To fire the gun, the defendant would have had to find ammunition, bring it to the apartment, and load the gun. The small amount of cocaine possessed makes it somewhat less likely that, in fact, he had (or would have) done either. In context, the defendant's "admission," *ante* at 466, does not seem particularly relevant.

Of course, one cannot exclude the possibility that any gun that is present, the way this gun was present, might be put to active "use." But that is so virtually whenever a gun is present near the scene of a drug crime. To find a "possession for protection" (i.e., a "use") here is, in effect, to find that possession of a gun (when related to a drug crime) *automatically* means a "use." It thereby erases the line that the statutes, and the courts, have tried to draw, and again

allows the "use" statute to swallow up the "possession" Guideline.

A brief review of these cases indicates rather strong support for the distinction I am drawing. Consider cases in which courts have permitted a jury to infer that a defendant "used" nearby guns to "protect" a stash of drugs. They involve drug-related risks of actually firing or brandishing (or "carry[ing]") the gun that are significantly greater than the risks present here. In this circuit's *Hadfield* case, for example, the inference—that the defendant "used" the guns to "protect" the drugs—was neither uncertain nor theoretical: it was inescapable. The defendants ran a massive drug operation from a barn that contained hundreds of marijuana plants, thousands of dollars in cash, and several guns, at least two of which were loaded, standing on a nearby gun rack or hanging on the barn walls. A sign near the barn said, "This house guarded by shotgun three nights per week. You guess which three." 918 F.2d at 991. A clearer case of using guns for protection is hard to imagine.

Our *Wilkinson* case, although closer, presented a somewhat different legal question. There, the defendant "carr[ied]" with him to a friend's house a duffel bag that contained two loaded guns (wrapped in a towel) and a cache of drugs (although the *Wilkinson* opinion is silent on the point, the record indicates that the guns were loaded). The proximity of loaded guns to the drugs and the fact that the defendant was carrying them together from place to place permitted the jury to infer that the defendant "intended the guns for protection," and thus that he carried them "in relation to" his drug crime. *Id.* at 25–26. (Since *Wilkinson* involved the statutory terms "carry" and "in relation to," strictly speaking it did not raise the "use/possession" problem here discussed.)

Similarly, other cases allowing an inference of presence "for protection" have involved close proximity and *loaded* guns, or *large* drug operations, or *multiple* weapons, or *easy* accessibility, or *some* factor suggesting more than a theoretical possibility that the guns might be used to protect the drugs if necessary. *See, e.g., Castro–Lara,* 970 F.2d at 983 (gun was "near a large sum of cash, in

close proximity to live ammunition" while defendant was "taking delivery of a sizable quantity of cocaine"); *Plummer,* 964 F.2d at 1254 (gun in defendant's car with ammunition in easy reach of driver; evidence that defendant "had moved" the gun); *United States v. Abreu,* 952 F.2d 1458, 1466 (1st Cir.) (five weapons in apartment with "significant amount" of drugs; testimony and palmprint connected the guns to defendants' drug operation), *cert. denied,* —— U.S. ——, 112 S.Ct. 1695, 118 L.Ed.2d 406 (1992); *see also United States v. Wesley,* 990 F.2d 360 (8th Cir. 1993) (fully loaded gun found on floor within reach of sleeping defendant); *United States v. Hager,* 969 F.2d 883 (10th Cir.) (three guns, at least one loaded, found near 2.8 kilograms of cocaine in apartment), *cert. denied,* —— U.S. ——, 113 S.Ct. 437, 121 L.Ed.2d 357 (1992); *United States v. Torres–Medina,* 935 F.2d 1047 (9th Cir.1991) (loaded gun found next to cocaine); *United States v. Boyd,* 885 F.2d 246 (5th Cir.1989) (loaded shotgun in arm's reach of defendant near methamphetamine manufacturing operation; agent testified that defendant had taken shotgun from car with drug paraphernalia and took it with him during a subsequent journey); *United States v. Acosta–Cazares,* 878 F.2d 945 (6th Cir.) ("numerous loaded weapons," thousands of dollars in cash, and two kilograms of cocaine found in two apartments used by coconspirators; coconspirator testified that defendant carried weapons while engaging in drug transactions), *cert. denied,* 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989); *United States v. Anderson,* 881 F.2d 1128 (D.C.Cir.1989) (crack house contained several loaded weapons, large quantities of crack cocaine, cocaine powder, and cash; expert testimony indicated that weapons frequently protect "crack houses"); *United States v. Matra,* 841 F.2d 837 (8th Cir.1988) (fortress contained numerous loaded weapons, ammunition, thousands of dollars of cash, and hundreds of thousands of dollars worth of cocaine).

Consider, by way of contrast, cases in which courts have refused to permit the jury to infer that the defendant "used" nearby guns to protect a stash of drugs. Many seem to involve risks of firing or brandishing (or displaying) a gun at least as great as those present here; in some, the risk seems greater. In *United States v. Robinson,* the D.C.Circuit refused to permit a "used for protection" inference where a defendant kept an unloaded pistol and drugs in a locked footlocker in a closet (the footlocker, in contrast with *Wilkinson,* apparently was not "carried" from place to place). 997 F.2d 884, 887–88 (D.C.Cir.1993). In *United States v. Sullivan,* 919 F.2d 1403 (10th Cir.1990), even though defendant kept an unregistered gun in her home where she also maintained a drug laboratory (and was convicted for possession of an unregistered firearm), the court refused to permit the "protection" inference because no additional evidence supported an intent to use the weapon in that way with respect to the drug operation. *Id.* at 1432 & n. 45. In *United States v. Derr,* 990 F.2d 1330 (D.C.Cir.1993), the court would not permit the inference where the defendant kept an unloaded pistol and his drug supply in a locked closet. *See also, e.g., United States v. Matthews,* 942 F.2d 779, 783–84 (10th Cir. 1991) (reversing § 924(c) conviction where, despite presence of weapons in plain view in an apartment containing drugs, evidence did not suggest that defendant "intended to avail himself of the firearms"); *United States v. Bruce,* 939 F.2d 1053, 1055–56 (D.C.Cir.1991) (reversing § 924(c) conviction because presence of loaded gun in one pocket and drugs in other pockets of defendant's raincoat indicated intent to use the gun in connection with future distribution, not protection of present possession). The theoretical possibility of active use was always present in these cases, but the courts considered it too remote to allow a jury to find, beyond a reasonable doubt, that the gun was present "for protection."

Of course, one might simply argue that these cases are not all consistent with each other. However, whether or not that is so seems to me beside the point. The division in the case law indicates a perceived need to draw a legal line between simple possession of a gun and its use. In order to draw that line, one must say that at some point, the risk that a defendant will actually fire or brandish or display a nearby gun "to protect" a drug stash becomes too small to permit the jury to infer an intent to protect. Our previ-

ous cases lie on one side of that line. If we are to maintain the legal distinction that courts have tried to draw (and if we are to avoid collapsing the "possession" Guideline into the mandatory five-year term of the "use" statute), this case, as the district court held, must lie on the other.

For these reasons, I would affirm the decision of the district court.